Edward L. MARTIN and Doris Mae Martin,
Appellants,

v.

UNION PRODUCTS, INC., Appellee.

No. 2285.

Supreme Court of Alaska.

Dec. 1, 1975.

Charles E. Cole and Catherine A. Chandler, Fairbanks, for appellants.

Lloyd I. Hoppner of Rice, Hoppner & Hedland, Fairbanks, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

## OPINION

ERWIN, Justice.

As the result of a fire which substantially damaged the home of Mr. and Mrs. Martin, we are presented with questions pertaining to the instructions on the degree of negligence and the doctrine of last clear chance.

In the summer of 1969, plaintiff-appellants Edward and Doris Martin constructed a home in the hills north of Fairbanks. They did a substantial portion of the work

themselves, utilizing high quality materials and very sound construction techniques. A fire closet was installed on the upper floor, with a hose which could reach all rooms. The cost of the house approached $150,000.

Edward Martin is a man with somewhat extensive technical expertise. He was Director of Public Works for the City of Fairbanks, held degrees both in physics and in petroleum engineering, and had work experience with ranged from construction projects to running a service station.

Recurrent power outages during the first several winters in his new home induced Mr. Martin to install a gasoline generator in the well room of his basement for emergencies. He also bought a 500-gallon fuel tank from a local welding company which had sold hundreds of such tanks in the Fairbanks area.

Martin's installation job was meticulous in all but one particular. A $3/8''$ copper tube extended from the tank's bottom, up through a fitting in the top, curved six inches above the buried tank, and entered a buried $1/2''$ steel pipe which protected it from breakage. The copper tube emerged from the pipe inside the basement well room. Although it was to be inserted into the generator, Martin had decided to leave it temporarily unattached, so that he could suck with his mouth to begin the siphon once the tank was filled, sparing the generator and its batteries the strain of pumping a dry line. His testimony is that he coiled the line several times and hung it on a nail in the ceiling joist, which was approximately $2\frac{1}{2}$ feet above the top of the tank but below the top of the tank's fill pipe and vent. However, Martin testified it was "hydraulically" higher than the fill pipe due to the coils in the line. The end of the copper tube was uncapped because Martin did not wish to install the three-way valve he had purchased, only to remove it again to start the siphon.

In October of 1972 Martin visited the offices of defendant-appellee Union Products, Inc., a corporation which delivers Union Oil products for a commission. Martin testified that he was asked whether he wanted 500 gallons, or if he wanted the tank filled; he indicated the latter. Martin believes he told Union of the generator but agrees that the foreman of the Union Oil Bulk Plant, a personal friend, may also be correct in the assertion that this was not mentioned.

Frank Hamsher, a gasoline deliveryman employed by Union Products, set out on the morning of October 13, 1972, to fill Martin's order. Written instructions stapled to the invoice told him to "Fill 500 gallon tank." Hamsher asked for directions from a neighbor of the Martins at approximately 9:30 a. m.

Hamsher describes the filling of the tank as routine and uneventful; he inserted the nozzle into the fill pipe, locked it at maximum flow (40–60 gallons per minute), and stood by. He recounts that the nozzle was equipped with a conical rubber device which sealed the fill spout and whistled as gasoline entered, until the rising gas reached the top of the tank and blocked the vent pipe, stopping the flow of air and thus the whistle. At this point Hamsher ceased pumping; he maintains that only a tiny amount of gas would have been left in the fill pipes proper and that he spilled virtually no gas on the ground. According to Union Products' documentation, 532 gallons had been delivered.

The manager of the company which welded the tank testified that it was fabricated from standard sized blanks received from steel mills. Using outside dimensions, he calculated that the tank could hold 513.8 gallons. When asked on cross-examination to maximize all conceivable variations, including some unrealistic ones, he calculated a volume of 523.9 gallons.

Union Products consistently maintained that no gas had been spilled on the ground. However, there is testimony from which it could be determined that a spill occurred in addition to the amount delivered which could not fit in the tank. Experts from Arctic Alaska Testing Laboratory and the

University of Alaska, as well as Martin himself, testified to the presence of hydrocarbons in the soil around the fill spout and tank. The testimony indicated that a significant amount of gas would have to be spilled to cause the hydrocarbon test to register positive.

At about 3:30 p. m., a neighbor noticed flames shooting from the house and telephoned the fire department. Mr. and Mrs. Martin were notified at work and arrived to find their home completely engulfed in what was obviously a petroleum based fire. By concentrating on the well room, the firefighters were able to temporarily abate the fire there. Martin and the University of Alaska Fire Chief entered and discovered the copper tubing at ground level but emitting no gas. The house was a total loss.

It is impossible to do more than hypothesize how the fire occurred. The Martins made two alternative contentions: (1) that an overflow from the tank ran down the window well near the overflow pipe and accumulated on the floor in the room next to the pump room, the shop room, where it ignited; or (2) that the pumping of extra gas into the tank forced gas through the line attached to the ceiling and caused a siphon effect and the resulting fire. Union Oil contends that the gas began to siphon through the open copper tube which had no closing valve and which was left down instead of being attached to the basement ceiling as claimed, and was perhaps ignited by a spark from the electrical appliances present in the well room.

Presumably, gas would only have begun to siphon once its level in the fill pipe reached a point above the highest portion of the copper tube. The highest point would have been the end of the tube if it had in fact been fastened to the ceiling joist; or the point of entry into the house, if the tube was in fact hanging freely within the the well room. (This analysis discounts the possibility that pressure divergences within the tank due to the injection of fuel might have caused siphoning even before the tank was completely full, if the line was down; no evidence was offered to support such a theory.) Assuming the line was fastened high, only a relatively small amount would have entered the house before the levels equalized and the siphon broke.[1] If the line was down, the siphon, once started, would have continued for hours.

A professional fire investigator hired by the Martins estimated that approximately 100 gallons had flowed from the tank. In order to account for this, and perhaps considering Martin's assertion that he had left the line coiled high, the investigator theorized that a limited amount of gas had entered the room when the tank was overfilled. Ignition occurred shortly, and heat caused the line to drop to the ground. Thereafter, gas flowed through a floor drain into the septic tank and cesspool, at the rate of one gallon every three minutes. The fire spread but did not consume the house, due to insufficient oxygenation, until a window blew out later in the afternoon.

Under this theory the house could have been saved only if firefighting had been initiated within the first hour after ignition. Possibly the principle virtue of this hypothesis for the Martins was that it aided them on the issue of contributory negligence, i. e., it explained the significant outflow of fuel without conceding that the line was originally left down.

Union Products' hypothesis has the virtue of simplicity. It argues the likelihood that the line was down at the time of any overfill, and that the outflow continued for six hours until ignition occurred and the fire was discovered. At the rate of one gallon per three minutes, approximately 125 gallons would have flowed into the well room and septic tank.

---

1. An overfill would have forced gas up into the vent pipe, as well as the fill spout. A second fill spout was capped; trapped air would prevent it from filling completely. Exhibit 10 shows no hydrocarbons present in the window well.

A safety manual printed by Union Oil of California stated, "Do not attempt to fill any tank to within less than ten gallons of its total capacity." There was no indication that this rule addressed any danger other than spillage. In the event of a spill, Union Products drivers were under instructions to notify the manager, who would then investigate to ascertain if any danger of fire or explosion was posed. The manager was never notified of a spill at the Martins' home.

Appellants offered instructions on the doctrine of last clear chance based on their view of the evidence that a spill had occurred and that Union had done nothing to avoid the consequences of their own negligence by notifying them of the spill. Such a view postulates negligence of appellants in the installation of the tank and tube by the Martins.

Appellants also offered specific instructions as to the duty of care to be exercised by Union Products in filling the tank with gasoline. Both appellants and appellee agreed that gasoline should be handled with extreme caution.

Neither of appellants' requested instructions were given by the trial court, which instead gave defendant's requested instruction #5, which alluded to the duty of care in handling gasoline in the following terms:

Because of the great danger involved in the transmission of gasoline from an outside storage tank through a line or tube into one's residence, a person of ordinary prudence will exercise extreme caution when engaged in such activity.

The Martins contend that the failure to give the proposed instructions was error, and the Martins further argue that the instruction given erroneously required a high degree of care from them, and that an unfair burden was imposed because the court failed to instruct that Union Products had a similar duty to exercise "extreme caution" during the delivery of the gasoline.

Before examining this claim further, we feel it appropriate to remind the members of the bench and bar of previous decisions of the court concerning the use of different degrees of care in negligence actions.

This court held in *Patterson v. Cushman*, 394 P.2d 657, 662 (Alaska 1964), that there are no separate degrees of care for various activities, but rather a unitary standard:

[W]e believe that the better view is that expressed by Dean Prosser as follows:

Although the language used by the Courts sometimes seems to indicate that a special standard is being applied, it would appear that none of these cases should logically call for any departure from the usual formula. What is required is merely the conduct of the reasonable man of ordinary prudence under the circumstances, and the greater danger, or the great responsibility, is merely one of the circumstances, demanding a greater amount of care [footnote omitted].

Under this view that there are no degrees of care as a matter of law . . . the trial judge need only instruct the jury that the defendant is required to exercise toward the plaintiff ordinary care under the circumstances [footnote omitted].

In *National Bank of Alaska v. McHugh*, 416 P.2d 239 (Alaska 1969), the defendant requested the trial court to focus the jury's attention on particular factors relevant to contributory negligence; this court held that an ordinary care instruction, standing alone, sufficed.

The instant situation goes slightly beyond *Patterson* and *NBA*, for here the trial court properly instructed on the degree of care—ordinary prudence—but went on to instruct as the *amount* of care required: the ordinarily prudent man "will exercise extreme caution when engaged in such activity." We deem such an instruction inappropriate in view of our previous decisions as cited.

With regard to the instruction given, a majority of the court is of the opinion that it was erroneous for:

It is misleading to instruct a jury that they must require of a party a high, a very high, or an extraordinary degree of care or that a party must have exercised the utmost or extreme caution because of the presence of some recognized dangerous instrumentality in a particular situation [citations omitted]. . . . This impedes instead of assisting evaluation of the acts of a party as negligent or careful and should not be injected into jury deliberations. [citations omitted] *Edgar v. Brandvold,* 9 Wash.App. 899, 515 P.2d 991, 993 (1973).

It is unclear why the court decided the "extreme caution" formulation did not apply equally to Union Products, once the decision was made to move beyond the simple "ordinary prudence ·under the circumstances" standard ordained by *Patterson.* Counsel for appellee objected only to the last sentence of plaintiff's instruction #9:

Mr. Hoppner: We'd object to that last phrase. I don't . . .

Mr. Cole: Well, let's strike out that last phrase.

Mr. Hoppner: Well, then the whole last sentence should go out, because you're instructed that they—I don't quarrel with the fact that in handling gasoline, that people have an obligation to exercise a high degree of care and I think that's instructed there before. The first phrase of that sentence is just repetitive of the previous [presumably Plaintiff's #4].

The Court: Well, the *Keck* case [*Keck v. Bairs*, 437 P.2d 380, ([150] Mont. [562] 1968)] is one—that I haven't had a chance to read—and read it in relation to another instruction.

Mr. Hoppner: The last phrase there, Your Honor, I think is misleading to the jury . . . to a jury, what it means then, is almost an instruction of absolute duty. And I think that the jury is sufficiently instructed by simply being told in handling gasoline, that you're required to use a high degree of care. Period.

Given the judge's decision that transmission of gasoline into the Martin household was a dangerous activity requiring extreme caution, it is not obvious why plaintiff was not entitled to a like instruction as to defendant's handling of the very same dangerous substance, when the case went to the jury on the issue of defendant's alleged negligent delivery. The court itself opined that sellers, consignees, and users of gasoline must be equally cautious.

The Martins were faced with a very powerful contributory negligence argument; if the jury got the impression that Union Products need be less careful than they, severe prejudice might have ensued. It was reversible error to hold appellants to a higher standard of care in the handling of gasoline than was required of appellee.

Because two of our colleagues dissent on this portion of the opinion, we further consider the claim of error on the issue of last clear chance. There are no decisions of the Alaska Supreme Court treating the issue of last clear chance; the only Alaska authority is federal.[2] Given our comparative negligence decision, *Kaatz v. State,* 540 P.2d 1037, Opinion No. 1187 (Alaska, 1975), the issue is all but moot; but it is necessary for decision of this case to announce the court's view as to the governing law at the time of trial.

The last clear chance doctrine is both complex[3] and devoid of rational theoretical underpinnings. Prosser believed that the doctrine's wide currency is a response

2. *Benson v. United States*, 235 F.Supp. 495 (D.C.Alaska 1964) ; *Rowe v. United States*, 116 F.Supp. 553, 14 Alaska 463 (D.C.Alaska 1953).

3. See the truly arcane analysis offered in Wooten, Jr., The Last Clear Chance Doctrine in Alaska, 2 UCLA-Alaska L.Rev. 207 (Spring 1973).

to the harshness of the contributory negligence rule.[4] Broadly stated, the doctrine decrees that

> the negligence of the plaintiff does not preclude a recovery for the negligence of the defendant where it appears that the defendant by exercising reasonable care and prudence might have avoided injurious consequences to the plaintiff notwithstanding the plaintiffs negligence.[5]

Appellee argues for adoption of the "discovered peril" rule in Alaska. However, that rule seems an unnecessarily grudging application of the last clear chance doctrine. If, for example, a plaintiff's negligent driving has caused an accident and left him trapped in his car on a railroad crossing, the mere fact that a conductor has missed his opportunity to avoid a collision because he was catnapping should be an inadequate excuse. Sound social policy does not require that a plaintiff's negligence be interposed as a shield to liability in such situations.

The Second Restatement of Torts § 479 frames the helpless plaintiff rule as follows:

> A plaintiff who has negligently subjected himself to a risk of harm from may recover for harm caused thereby if, immediately preceding the harm,
>
> (a) the plaintiff is unable to avoid it by the exercise of reasonable vigilance and care, and
>
> (b) the defendant is negligent in failing to utilize with reasonable care and competence his then existing opportunity to avoid the harm, when he
>
> (i) knows of the plaintiff's situation and realizes or has reason to realize the peril involved in it or

(ii) would discover the situation and thus have reason to realize the peril, if he were to exercise the vigilance which it is then his duty to the plaintiff to exercise.

The more recent federal case on last clear chance in Alaska, *Benson v. United States*, 235 F.Supp. 495 (D.C.Alaska 1964), set forth a very similar formulation.[6] The Restatement thus provides a standard which may appropriately be applied to this case.

American courts have tended to subdivide plaintiffs into two major categories for last clear chance purposes: inattentive plaintiffs and helpless plaintiffs. There seems to be little disagreement as to the former. If the plaintiff is merely inattentive and could avoid the danger almost until the time of injury, most courts decline to impose liability on the daydreaming defendant who fails to actually discover plaintiff's peril. The element of defendant's superior opportunity to act is not present, and the Second Restatement of Torts, § 480, would deny recovery absent actual knowledge of the plaintiff's situation. Under the Restatement view, the Martins will lose if they are found by the court to be inattentive plaintiffs, for there is no evidence in the record that Union Products actually knew of the perilous situation inside the Martin home.

Courts split when it comes to the second area of the doctrine, dealing with the helpless plaintiff whose negligence has put him in a position of inextricable peril. A minority, the "discovered peril" jurisdictions, require that even in this situation a defendant must have actual, as opposed to constructive, knowledge of plaintiff's predicament.[7] However, a considerable

---

4. Prosser, Handbook on the Law of Torts, § 64 at 428 (4th ed. 1971).

5. 57 Am.Jur.2d Negligence § 387.

6. The district court for the Territory of Alaska also used this formula in *Runnels v. City of Douglas*, 124 F.Supp. 657, 15 Alaska 221 (D.Alaska 1954).

7. *See Brandelius v. City & County of San Francisco*, 47 Cal.2d 729, 306 P.2d 432 (1957); *Silva v. Oishi*, 52 Haw. 129, 471 P.2d 524 (1970); *Walker v. Spokane, Portland and Seattle Ry.*, 262 Or. 606, 500 P.2d 1039 (1972).

majority[8] of courts and the Second Restatement, § 479, take the position that if defendant fails to discover plaintiff's danger when he is under a duty to do so and the requisite vigilance would have enabled him to act in time, liability ensues.

We, however, need not decide the various nuances of the doctrine to be applied in the future for the doctrine has been abolished in *Kaatz,* where this court adopted comparative negligence.

However, a majority of the court is also of the opinion that it was error in this case to fail to give any instruction on last clear chance, for there was evidence to support such a defense. Either on the basis of testimony indicating an extensive spill of the gasoline or on the theory that the placing of 535 gallons into a 500-gallon tank placed the defendant on knowledge that an overflow or leak was occurring somewhere in the system, the defendant may be regarded as having reason to realize that a peril was involved. Since the plaintiffs were not home, they were helpless as far as preventing the fire. It may be argued that the defendant had an opportunity to avoid harm by notification of the plaintiff, in which event the plaintiff may have been able to have discovered the problem and prevented a fire. The retrial of this case is covered by *Kaatz,* and no useful purpose would be served by further elaboration of the doctrine.

The case is reversed for retrial under the standards reflected in *Kaatz v. State of Alaska,* 540 P.2d 1037, Opinion No. 1189 (Alaska, 1975).[9]

BOOCHEVER, Chief Justice, with whom RABINOWITZ, Justice, joins, concurring.

While I agree with the majority's opinion with reference to the general inadvisability of giving instructions pertaining to different degrees of care in negligence actions, I do not find that the instruction here given was so unbalanced as to constitute reversible error. The instruction stated:

> Because of the great danger involved in the transmission of gasoline from an outside storage tank through a line or tube into one's residence, a person of ordinary prudence will exercise extreme caution when engaged in such activity.

Since the instruction involved transmission of gasoline and since Union Oil Company initiated the transmission of that gasoline, I read the instruction as applying equally to Union Oil Company and the Martins. Otherwise, I would agree with the majority that in the event that a special instruction as to degree of care were to be given in this type of case, it should be given as applied to both parties. Since I consider that this was done in this case, I cannot consider the instruction as constituting reversible error.

Although I find it a very close question, I concur in the majority's opinion to the effect that the evidence presented justified the giving of a last clear chance instruction.

---

8. *See* Prosser, Handbook on the Law of Torts, § 64 at 430 (4th Ed. 1971) ; 2 Harper and James, The Law of Torts § 22.13 at 1248 (1956).

9. Justices Erwin, Burke and Connor concur on the negligence issue. Justices Erwin, Rabinowitz and Boochever concur on the issue of last clear chance.